UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LEAL R. PICKERING,          :     CIV. NO.: 3:14CV1207(VLB)
WANDA SAMPEL,
     Plaintiffs,

vs.

AUGUST DeFRANCE, et al.       :     FEBRUARY 1, 2016

## LOCAL RULE 56(a)1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56(b) of the Federal Rules of Civil Procedure and Local Rule 56(a)1, defendants offer the following undisputed facts in support of their motion for partial summary judgment:

1.    At all times relevant, plaintiffs, Leal Pickering and Wanda Sampel ("Mr. Pickering" and "Ms. Sampel") resided at 44 Rome Avenue, Middletown, CT.  See Complaint, ¶¶ 3-4; Exhibit ("Ex.") A, Pickering Deposition Transcript, p. 15; Ex. B, Sampel Deposition Transcript, p. 7.

2.    At all times relevant, defendants ("Officers") August DeFrance, Robert Kraeger, Louis Julia, James Remotti and Daniel Schreiner were employed and on duty as patrol officers in the Middletown Police Department. See Ex. C, DeFrance Deposition Transcript, pp. 4-5; Ex. D, Kraeger Deposition Transcript, pp. 4-5; Ex. E, Julia Deposition Transcript, p. 5; Ex. F, Remotti Deposition Transcript, pp. 4-5; Ex. G, Schreiner Deposition Transcript, pp. 4-5.

3.     At all times relevant, defendant Michael Lukanik ("Sergeant Lukanik") was employed and on duty as a sergeant in the Middletown Police Department. See Ex. F, Michael Lukanik's Deposition Transcript, p. 17.

4.     Prior to September 23, 2012, neither plaintiff had encountered any of the named defendants to their knowledge.  See Ex. A, pp. 34-35; Ex. B, p. 25.

5.     Prior to September 23, 2012, Sergeant Lukanik had worked in the MPD narcotics unit for three years; he used a NARK #30001 Field Test Kit numerous times in the field during that timeframe, and several of those tests came back positive; he never had a NARK #30001 return a false positive.  See Ex. F, pp. 6-7, 12, 47.

6.     On September 22, 2012, Officer Kraeger received a tip from an anonymous informant that a female named Wanda Sampel and a man named "Lee" were selling heroin out of their residence at 44 Rome Avenue in Middletown.  See Ex. C, p. 13; see also Ex. D, pp. 14-16, 23-24.

7.     On September 22, 2012, Officer Kraeger ran a check on "Wanda Sampel" in the MPD computer system, which indicated a past narcotics arrest and an address of 44 Rome Avenue.  See Ex.  D, pp. 54-55; Ex. K, Criminal Case Detail, Docket # H12M-CR10-0231517-S.

8.   At the outset of his shift the next morning, September 23, 2012, Officer Kraeger relayed the information in Paragraphs 6 and 7, *supra*, to Officers DeFrance and Sergeant Lukanik.  See Ex. C, pp. 41-42; Ex. D, pp. 19-20; Ex. F, pp. 16-17.

9.   Later that morning, at approximately 9:15 a.m., plaintiffs and their minor daughter got into a Dodge Caravan owned by Mr. Pickering; Ms. Sampel then drove the vehicle down Rome Avenue, turned right onto Spring Street, and left onto Pearl Street in Middletown.  See Complaint, ¶¶ 7-8; Ex. C, pp. 36-37.

10.  Ms. Sampel knew that her driver's license was suspended; Mr. Pickering did not have a valid license at the time either. See Ex. A, p.88; Ex. B, pp. 29-31.

11.  Officer DeFrance observed plaintiffs' vehicle travelling Southbound on Rome Avenue, and also observed that its center brake light was inoperable, and a state issued handicap placard was hanging from the rearview mirror.  See Ex. A, p. 63; Ex. C, pp. 18, 21-22; Ex. I, Incident Detail Report, 9/23/12, p. 4.

12.  Officer DeFrance knew that the handicap placard contained instructions to remove it from the rear view mirror while operating the vehicle. See Ex. A, p. 63; Ex. C, p. 24.

13.  Ms. Sampel had never read the handicap placard prior to the motor vehicle stop. See Ex. B, p. 31.

- 3 -

14.   Based on his observation of the inoperable brake light and handicap placard on the rearview mirror, Office DeFrance activated his cruiser's lights and pulled plaintiffs' vehicle over on Pearl Street.  See Ex. A, pp. 84-85; Ex. C, pp. 17-18, 43-44, 56, 59; Ex. I, p. 5.

15.   Officer DeFrance approached the driver's side of the Caravan and asked Ms. Sampel for her license and registration; Sampel produced a Connecticut ID card but no driver's license. See Ex. A, p. 87; Ex. B, p. 31; Ex. C, p. 36.

16.   Officer DeFrance returned to his cruiser and used the Mobile Data Terminal to confirm that Ms. Sampel's driver's license was suspended.  See Ex. A, pp. 88-89, 91; Ex. B, p. 33; Ex. C, p. 36.

17.   Officer DeFrance then radioed for backup officers to respond to the scene; Officers Kraeger, Remotti, Julia and Schreiner responded to the scene.  See Ex. C, p. 36-39; Ex. D, pp. 32-33; Ex. E, pp. 10-12; Ex. F, pp. 9-11; Ex. G, p. 11.

18.   Officer Remotti was riding in a cruiser with Officer Kraeger, his field training officer at the time; Officers Julia and Schreiner responded to motor vehicle stop in their own cruisers.  See Ex. C, p. 40, 21; Ex. E, pp. 10-13; Ex. F, pp. 10-11.

19.   Officer DeFrance returned to Sampel's driver's side window, and advised her that her Connecticut driver's license was suspended. See Ex. A, pp. 88-89, 91; Ex. B, p. 33.

20.   At the time of the stop a clear plastic bag with hearts on it containing 42.2 grams of off-white powder was perched in plain view in a cup holder; it was clearly visible through passenger side windows.  See Ex. A, pp. 95-96; Ex. B, pp. 40-42; Ex. C, pp. 47-49; Ex. D, pp. 35-36; Ex. H, p. 42.

21.   Officer Kraeger observed the bag containing the powder substance while standing outside the passenger side of the vehicle.  See Ex. C, p. 39; Ex. D, pp. 35-36.

22.   The powder appeared to Officer Kraeger, based on his training and experience, to be consistent with heroin. Id., pp. 36, 43.

23.   Ms. Sampel was asked to exit the vehicle and stand toward the rear passenger side of the Caravan; she was not handcuffed.  See Ex. B, pp. 33-34; Ex. D, p. 45.

24.   Mr. Pickering was asked to exit the vehicle and sat ten feet away from it, on steps off the sidewalk where he was monitored by Officer Remotti; Pickering was not handcuffed yet. See Ex. A, pp. 92-94; Ex. B, pp. 49-50; Ex. D, p. 45; Ex. F, 19-21.

25.   After Mr. Pickering was out of the van, an officer asked Ms. Sampel what was in the plastic bag and she stated it was Herbalife.  See Ex. B, pp. 48-50.

26.   Officer Kraeger field tested the powder in the bag using the NARK #10003 Field Test Kit; both Officers Kraeger and DeFrance observed a positive color reaction for heroin.  See Ex. C, pp. 53-54; Ex. D, pp. 46-47, 58-60, 64-65.

27.   Officer Kraeger knew how to use the test kit from past training and experience; performed this test in accordance with simple instructions set forth on the box; and had no reason to doubt the accuracy of the result.  See Ex. D, pp. 7-8, 47-48, 60, 65-66.

28.   Officer Kraeger did not document the color change sequence which indicated a positive result in his incident report, but he did document the fact that the substance field tested positive for heroin.  Id., p. 48.

29.   Ms. Sampel observed two officers on scene confer, and then saw one of them return to a cruiser, retrieve a field drug test kit, and hand it to the other officer.  See Ex. B, pp. 51-52.

30.   Ms. Sampel does not know how field drug test kits work or how to recognize positive results. Id., p. 52.

31.   Ms. Sampel concedes that she did not observe the results of the first field test.  Id.

32.   Ms. Sampel claims she has never seen heroin and does not know what it looks like.  Id., p. 76.

33.   Because of his extensive history Sergeant Lukanik was summoned to the scene to perform a second field test using the NARK #30001; he did so and observed a positive color change for heroin. See Ex. B, pp. 52-53; Ex. D, pp. 58-61; Ex. F, pp. 6-8, 14.

34.   Officers Kraeger and DeFrance also observed this second field test and the positive color change for heroin.  See Ex. C, pp. 50-51; Ex. D, p. 49.

35.   The substance also appeared to Sergeant Lukanik, based on his training and experience, to be consistent with heroin. Id., pp. 42, 46.

36.   Plaintiff Sample saw the vial Sergeant Lukanik used to conduct the second field test, and contends that at some point it was "clear."  See Ex. B, p. 54, 56.

37.   Mr. Pickering did not personally observe the first or second field test kit, or the officers conduct the field tests. See Ex. A, pp. 91-92, 95.

38.   At the scene photographs were taken of the interior of the vehicle, including one which captures the clear plastic bag

with hearts on it containing a powdery substance.  See Ex. A, pp. 69-70; Ex. J, Photo.

39.   Plaintiffs complained that the powder substance was Herbalife purchased by Ms. Sampel; however, they concede that it was not contained in its original packaging.  See Ex. A, p. 70; Ex. B, pp. 43-44.

40.   Plaintiffs Sampel and Pickering were arrested after the two field tests conducted at the scene yielded positive results for heroin.  See Ex. C, p. 51, 61; Ex. H, pp. 37-38; Ex. I, p. 5.

41.   Plaintiffs were both charged several crimes listed in their complaint.  See Complaint, Count Three, ¶ 39; Count Four, ¶ 40; Ex. I, p. 4.

42.   Plaintiffs were both charged with risk of injury to a minor (C.G.S. § 53-21), because their juvenile daughter was in the vehicle next to the suspected heroin.  See Ex. C, pp. 56-57; Ex. H, 36.

43.   Ms. Sampel transported to and processed at the Middletown Police Department, and was detained there overnight until she posted bond the next day.  See Ex. B, p. 60.

44.   One of the crimes with which Ms. Sampel was charged in connection with the motor vehicle stop was operating a motor vehicle under suspension (C.G.S. § 14-215); she ultimately plead

guilty to that charge.  See Ex. B, p. 30; Ex. L, Criminal Case
Detail, Docket # MMX-MV12-0445141-T.

45.   On November 19, 2012, the State of Connecticut – DESPP
Division of Scientific Services tested the powder seized from
plaintiff's vehicle and found no controlled substances.  See
Complaint, Count Four, ¶ 43.

46.   While at the scene of the motor vehicle stop, Officer
Julia, Schreiner and Remotti provided traffic safety and
monitored plaintiffs and their daughter for officer safety
purposes; they did not search plaintiffs' vehicle or conduct
narcotics field tests.  See Ex. E, pp. 15-16; Ex. F, pp. 35, 39;
Ex. G, pp. 6, 11-12.

47.   Officer Julia released plaintiffs' daughter to a
family friend at the scene of the motor vehicle stop.  See Ex. E,
pp. 20-21.

48.   After the scene of the motor vehicle stop was cleared,
Officer Julia contacted DCF regarding the incident per
instructions from Sergeant Lukanik.  Id.; see also Ex. I, pp. 5-
7.

49.   A picture of the box and simple instructions for
testing substances with a NARK #1003 is submitted as Exhibit M in
support of defendants' motion.  See Ex. D, pp. 59-60, 64-66; Ex.
H, p. 14.

50.    Officer Kraeger transported the suspected heroin from the scene of the motor vehicle stop to the MPD, where he tested it a third time with it a NARK II kit #10 in the presence of Sergeant Lukanik.   See Ex. D, pp. 59-60; Ex. H, pp. 37-38.

51.  Officer Kraeger and Sergeant Lukanik both observed this third field test yield a positive colorchange for heroin as well. Id.

DEFENDANTS, AUGUST DeFRANCE, ROBERT KRAEGER, OFFICER ROMOTTI, LOUIS JULIA, OFFICER SCHREINER and SERGEANT LUKANIK

BY/ss/Patrick D. Allen

Patrick D. Allen
Federal Bar No.: ct28403
Karsten & Tallberg, LLC
500 Enterprise Drive, Suite 4B
Rocky Hill, CT 06067
Telephone (860)233-5600
Telecopier (860)233-5800
pallen@kt-lawfirm.com

- 10 -

## <u>CERTIFICATION</u>

I hereby certify that on February 1, 2016 a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's system.

/ss/Patrick D. Allen
Patrick D. Allen