UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| Leal R Pickering, | : | NO.: 3:14-cv-1207(VLB) |
| Wanda Sampel, | : | |
|     Plaintiffs | : | |
| | : | |
| vs | : | March 7, 2015 |
| | : | |
| August DeFrance, | : | |
| Robert Kraeger, et al | : | |

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

A.     Background

On Sunday September 23, 2012 at about 9:10 in the morning, Leal R. Pickering,

Wanda Sampel and their daughter decided to travel to McDonald Restaurant on South

Main Street in Middletown, CT. On that morning, Ms. Sampel was the driver of Mr.

Pickerling's van, a 1997 green Dodge Caravan. Sampel backed the van down the

driveway to get to Rome Avenue. Ms. Sampel could not see the south bound lane of

Rome Avenue, so she asked her daughter to lookout. Her daughter saw a police cruiser

traveling south very slowly on Rome Avenue. Ms. Sampel waited for the police cruiser

to clear the driveway than she pulled out on to Rome Avenue and drove in a southerly

direction.

At the stop sign located at Rome Avenue and Spring Street, Ms. Sampel and Mr.

Pickering saw the police cruiser in the driveway on private property just north of Rome

Avenue on the south side of Spring Street. Ms. Sampel made a right turn on to Spring

Street, and a left turn onto Pearl Street. A Middletown police officer in a cruiser stopped

them on Pearl Street. The police officer that executed the stop was Officer DeFrance.

Officer DeFrance told Ms. Sampel he stopped her because her windshield wipers were not working, and that the brake lights were out. Ex3, p32. Ms. Sampel told the police officer the brake lights were change on Friday, and that it is not raining out side. Id. The police officer collected Ms. Sampel Connecticut State Identification Card, insurance card, and registration papers. Id., p31.When the police officer returned, he told Ms. Sampel her driver license is suspended. Id., p33. Ms. Sampel said give me a ticket. Id. The officer when back to the police cruiser, and about five minutes later, a car pulled up in front of the van with a person in "regular clothes" and another police officer. Id. Subsequently other police officers arrived on the scene. Ex2. The police officer in regular cloths was Officer Kraeger.

Officer Kraeger asked Ms. Sampel to get out of the vehicle, and began to ask her questions. Ex3, p33-35. Ms. Sampel had nothing to tell the officer except that she works and they we were on their way to McDonald. Id, p35-36. While the other officer when to the passenger side. Id, p.33. Ms. Sampel was standing about ½ feet from the van near Mr. Pickering who was in the front passenger seat. Id., p35-37. Officer Kraeger then when inside of the van and began to search the van. Id., p38–42, 48-50; Ex 4, p91-92. Ms. Sampel overheard Mr. Pickering telling Officer Kraeger he did not give them permission to search his van; that you needed to get a warrant. Ex3, p38-39. Ex4, p90-91. Officer Kraeger ignored Mr. Pickering and continued searching the van. Officer Kraeger found the HerbaLife Product during the warrantless search of the van. Ex 4, p91-92. Ms. Sampel did not give consent to the van search. Ex3, p. 39; Ex4, p. 95.

Officer Kraeger pick-up the HerbaLife Product. Ex3, p40; Ex4, p91.The HerbaLife Product was in a cup holder on the right side of the van. Ex3, p40. The cup holder was

part of the side panel mounted to the rear right interior of the van. Mr. Pickering and Ms. Sampel daughter sat in the rear back seat next to the HerbaLife Product. Ex3, p40-41. Officer Kraeger than asked Ms. Sampel what is this? Ex3, p.40 Ms. Sampel told Officer Kreager he found her HerbaLife Product. Id. Ms. Sampel purchased the HerbaLife Product from Denise Andujar, who ran a business on Main and Ferry Street beneath the Chinese restaurant. Id., p42, Ex23, #7. A police officer in uniform got something out of the trunk of the unmarked car. Ex3, p51-52. Officer Kraeger tested the HerbaLife Product, placed it back in the cup holder and continued searching the van. Id., p52. Officer Kraeger kept returning back to the HerbaLife Product picking it up, throwing it around, and moving it. Id. Officer Kraeger spoke to the other officer who when back to the unmarked car and retrieve another test kit. Id. Officer Kraeger preformed a second test of the product. Id. Mr. Pickering saw Officer Kraeger test the HerbaLife Product twice. Ex.4, .91. Ms. Sampel was able to see the results of the second test. Ex3, p. 52-53. She observed the liquid in the vile was clear before the test; and the liquid in the vile was clear after the test. Id.

The officer in the white shirt arrived on the scene. Ex4, p55. The police officer in the white shirt was Sergeant Lukanik. Sergeant Lukanik was speaking with Officer Kraeger, Sergeant Lukanik when back to his police cruiser and returned to Officer Kraeger with a bag, a sandwich bag and brought it to Officer Kraeger. Ex4, p55. when back to his delivered a third test kit from the police cruiser he was driving. Ex4, p. 55-56. Officer Kraeger back was to Ms. Sampel; and she could not see over Sergeant Lukanik. Id. There was an exchanged of words between Officer Kraeger and Sergeant

Lukanik, and after the conversation, Officer Kraeger announced "Arrest them". Id, p. 56.

B.    LEGAL STANDARD

Summary Judgement is granted if the pleading, discovery material, and disclosure materials on file, and affidavits show that there is no genuine issue as to any material fact and that the movant is entitle to judgment as a matter of law. Fed.R.Civ.P § 56(c). "[N]ot only must there be no genuine issue as to evidentiary facts, but there must also be no controversy regarding the inferences to be drawn from then." Donahue v. Windsor Locks Board of Fire Commissioners, et al. 834 F.2d 54 (2nd Cir. 1987). A disputed regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Palmieri v. Kammerer, 690 F.Supp.2d (D.Conn. 2010). The Court views all reasonable inferences and ambiguities in a light favorable to the nonmoving party. Bryant v. Maffucci, 923 F.2d 979, 982 (2nd Cir 1991). "[T]he purpose of summary judgment is not to resolve factual disputes, but rather to see if there are any facts material to a claim that remain in dispute. Wolinsky V. Standard Oil of Connecticut, Inc., 712 F.Supp. 45, 51 (D. Conn 2010).

C.    DEFENDANTS CLAIMS OF UNDISPUTED FACTS

Disputed Facts

Defendants' claims of undisputed facts are misleading and confusing.

1.    The Tip

The facts show the anonymous tip lack content and is unreliable.

Officer DeFrance was presence when Officer Kraeger received a tip from a male they arrested on September 22, 2012.; Ex6, p10-11. On the same day Officer Kraeger told Officer DeFrance he received a tip from the arrested female that Wanda and Lee

were selling heroin out of their residence. Ex5, p13-14; Ex8, #3b-c. Defendant did not search the plaintiff's apartment for heroin. Ex8, #3d.

Officer Kraeger rejects Officer DeFrance account. Officer Kraeger said a male approached him on Main Street and Rappallo Avenue wanting to *pass along information he received* about individuals dealing narcotics in the Northend. Ex6, p10. The gentleman gave Officer Kraeger the names of Wanda and Lee and where they possibly lived. Id. Officer Kraeger did not learn where this gentleman got his information form. Ex6, p. 11.

Officer Kraeger documented the information of the tip in his notebook. Id.; Ex10. On September 22, 2012 Officer Kraeger notebook contains: Top line: "Newfield / Library 12-245 Liz"; Next line: "Narco"; next line: unreadable word; Next Line: "worh"; next line: cross out word "Rome Ave"; next line: "Wanda, Hector, Lee"; Next line: "SAMPLE H/M B/K". Ex6, p14; Ex10.

On September 23, 2012, "Officer Kraeger writes he received an anonymous tip on September 22, 2012 that Wanda and Lee "was selling heroin out of a red house located at 44 Rome Avenue on the 3rd floor." Ex11. What happen with Hector? During his deposition on September 30, 2015, Officer Kraeger testified the person who gave him the anonymous tip named Wanda Sampel and her boyfriend of Hector or Lee were selling heroin. Ex6, p16.

2.   Identifying the Vehicle

"The next morning (i.e. 9/23/12) Officer Kraeger relayed this information to Officer DeFrance and Sergeant Lukanik …" confusing.

On September 22, 2012, Officer Kraeger ran the names of plaintiffs on "our in-house computer" which gave him "a positive address of on Rome Avenue and a vehicle description". Ex6, p19-20. Neither the gentlemen nor the arrested female included a vehicle as part of their anonymous tip. Officer Kraeger has no documentation of a vehicle involved in the alleged illegal activity. Ex10; Ex11.

      3.    The Vehicle Stop

On September 23, 2012 Officer Kraeger relayed the description of the vehicle to Officer DeFrance, Officer Julia, and Sergeant Lukanik. Ex6, p19. Officer DeFrance and Officer Kraeger made a plan to stop the vehicle Officer Kreager described leaving 44 Roam Avenue. Ex7, p22; Ex12, #2.Officer DeFrance would stop the vehicle to do an investigation. Ex7, p 22. On September 23, 2012, Officer DeFrance executed a motor vehicle stop on the vehicle the plaintiffs were in. Ex9.

      i.    Officer DeFrance first reason for stopping the vehicle was defective windshield wipers in violation of C.G.S. § 14-99f[1]. Ex3, p32; Ex9. Ms. Sampel told Officer DeFrance that it is not raining outside. Ex3, p32.

ii.    Officer DeFrance second reason for the stopping of the vehicle Ms. Sampel was driving on September 23, 2012 was the rear center light was inoperable. Ex3,p23, Ex9. Officer DeFrance observed two brake lights were operating properly. Ex5, p31-32. Officer DeFrance knew Connecticut law requires a vehicle have at least two operable brake lights[2]. Ex5, p32.

---

[1] Examination of the record shows there are no facts in the records to support the charge of a window wiper violation under Connecticut laws.
[2] C.G.S. sec. 14-96e(a) "Each motor vehicle, trailer semitrailer and pole trailer shall be equipped with two or more stop lamps…"

iii.     Officer DeFrance last reason for stopping the vehicle was "a large handicap parking pass hanging on the rear view mirror, obstructing the operators' view." Ex9.

Officer DeFrance is a police officer with over 25 years of experience and knows the motor vehicle laws of Connecticut. Ex5, p15. In Officer DeFrance view "state law says that's hanging there, it's obstructing an operator's view." Ex5, p28. Then Officer DeFrance said by state statute[3] one "cannot place that placard on the mirror and drive around with it." Ex5, pp25-30. Officer DeFrance could not articulate what obstruction the handicap placard hang on the rearview mirror posed to the driver. Ex5, p23-31; Ex9. Although Officer DeFrance initially described the handicap placard as "large", he testified it was a "standard issue handicapped placard. Ex5, p23; Ex9.

Connecticut law permits the displaying of a handicap placard on vehicle being operated by or carrying a person with disabilities to whom the placard was issue. C.G.S. § 14-253a(3)(e)[4]. The handicap placard belonged to Mr. Pickering. Ex4, p59-60.

Officer DeFrance admitted he followed the vehicle plaintiffs were in south on Rome Avenue, right turn onto Spring Street, and a left turn onto Pearl Street.[5] Ex5, p. 23; Ex9. Officer DeFrance did not observe a driving pattern that would show the driver view was obstructive or distracted. Ex5, pp 23, 27-28, 58-59. Officer DeFrance can not articulate how the handicap placard hugging on the rearview mirror interfered with the driver ability to view the highways. Id.

---

[3] Later in Defendants' Brief Officer DeFrance rejects the state statues outlaw placing a handicap placard on the rearview mirror in favor of print instructions on the handicap placard.

[4] C.G.S. sec. 14-253a(3)(e) "…A removable windshield placard shall not be displayed on any motor vehicle when such vehicle is not being operated by or carrying as a passenger …a person with disabilities to whom the removal windshield placard was issued."

[5] Plaintiffs disagree with Officer DeFrance on the path he travelled just prior to the stop.

4. <u>Plain view</u>[6]

Defendant changes the facts testimony on plain view.

On page 3 in the 2nd paragraph of the Motion for Summary Judgment, the defendants write: "[f]rom that position he looked through the rear window of the vehicle and observed a clear plastic bag with red hearts on it, filled with 42.2 grams of an off-white powder." The pronoun "he" identifies that a male made this observation. Officer Kraeger admitted he discovered the HerbaLife Product, but it was not through the rear window. <u>Ex6,</u> p44-45.

Officer Kraeger describes how he saw the HerbaLife Product in plain view is unbelievable.

Q: Is that during the time you were speaking with Ms. Sampel?

A: No, I still had Mr. Pickering and Mr. – Officer DeFrance was still speaking with Ms. Sampel in the driver's seat.

Q: I'm confused. You were at the rear window?

A: It's a minivan.

Q: Okay. And Mr. Pickering was sitting back there?

A: No. Mr. Pickering was in the front seat, the right front seat. Sampel was in the driver's seat. Okay? The juvenile was in the bench seat in the middle.

Q: Okay.

A. Okay?

Q: And you were two feet from Mr. Pickering; is that correct?

A: Correct.

---

[6] Officer DeFrance said he had Mr. Pickering step out of the vehicle. This is inconsistent with Officer Kraeger police report that he removed the juvenile from the back seat and Pickering form the passenger seat.

Q: Okay. All right. And, so—okay, When did you make this observation?

A: As I was speaking to Mr. Pickering, I'm also watching the juvenile in the back seat, and I look and I observed through the window in plain view the suspected heroin.

Q: So, it wasn't the rear window?

A: It was the middle window, I would assume. I can't remember the exact window layout. It was on –it the right side middle to the rear.

Q: Is. That important, sir?

Mr. Allen: Object to the form. You can answer.

A: Is it important?

Q: Yes. Where were you position when you made the observation?

A: I was standing in the right front off of Mr. Pickering and it to my immediate – as I was looking and facing him, it was off to my immediate *right I observed it through the window*. So, I don't recall if the window – the van had three windows or two, but I observed it, it was in the window towards the rear, or the sliding door. So, I would say it would be the middle window, because the van had a sliding door, so it would have to be in the Middletown window. Id.

Officer Kraeger testified the suspected heroin was "in plain view *in the right rear cup of the passenger seat*…" Ex6, p35. From the position Officer Krager describes, he two feet in front of and looking back at Mr. Pickering, who sit in the front passenger seat, Officer Kraeger look through the middle window, which is tinted, down the right interior side of the van, pass the middle window, the cup holder which position lower that the bottom of the middle window to see the HerbaLife Product. Ex6, p44-45; Ex21. This is unbelievable.

5.    Color of the Product

On September 23, 2012, the following police officer document the color of the powdery substance found in the vehicle Ms. Sampel was driving:

i.    Officer DeFrance observed the HerbaLife Product on the scene and observed the product color was "off white". Ex9

ii.    Officer Romotti observed the HerbaLife Product when he check-in the product in the Evidence Room at the police station and observed the product was white/brown. Ex25.

iii.    Officer Kraeger tested a yellowish powdery product. Ex11. Officer DeFrance did not see the yellowish product Officer Kraeger tested. Ex5, p55.

iv.    Ms. Sampel the HerbaLife Product color is tan/beige. Ex13, #7.

D.    ARUGMENTS

1.    Legal Standard

"The Fourth Amendment guarantees the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." Whren v. United States, 517 U.S. 806, 809 (1996). "Fourth and Fourteenth Amendments according, such stops must be justified by probable cause or a reasonable suspicion, based on specific and articulable facts of unlawful conduct". U.S. V. Oates, 514 F.Supp.2d 211, 225 (D.Conn. 2007). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause that a traffic violation has occurred." Id. Police can stop a vehicle "so long as the stop is supported by objective probable cause for a traffic stop. U.S. v. McKreith, 708 F.Supp.2d 216, 221 (D.Conn 2010).

2. Tip

On September 22, 2012, Officer Kraeger received an anonymous tip that plaintiffs are selling narcotics out of 44 Rome Avenue. Ex5, p13-14; Ex6, 10-11, Ex8, #3b-c. It is unclear where Officer Kraeger got an anonymous tip from. No tipster informed Officer Kraeger plaintiffs selling heroin out of a motor vehicle or would be transporting heroin in a motor vehicle.

The Supreme Court "recognized that an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity    ." Alabama v. White, 496 U.S. 325, 329 (October Term, 1989). It is "important that the anonymous tip "contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but future actions of the third parties ordinarily not easily predicted." Id., p. 332. Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and the degree of reliability. Id., p. 330.

Officer Kraeger received one tip from two tipsters; one from a male, and the other from a female. The male tipster told to Officer Kraeger he had no personal knowledge of the plaintiffs selling narcotics. Ex6, p10.

The anonymous tip must have some underlying circumstances to conclude trustworthiness. Franks v. Delaware, 438 U.S. 154, 165 (October Term, 1977). Both tips had very little details, both contained commonly known information, and either tip provided future illegal activates for the plaintiffs. Even Officer Kraeger's notebook contains commonly known information, and also documents a "Hector", which either of the tipsters mentioned. Ex10.

The amount of information the anonymous tip contain is lacking in content, and at the same time the reliably factors are very low. The dissent warns "every citizen is subject to being seized and questioned by any officer who is prepared to testify that the warrantless stop was based on an anonymous tip predicating whatever conduct the officer just observed." <u>Alabama v. White</u>, 496 U.S. @ 333. This may be that case.

3.    Motor Vehicle Stop

"Fourth and Fourteenth Amendments according, such stops must be justified by probable cause or a reasonable suspicion, based on specific and articulable facts of unlawful conduct. Fourth and Fourteenth Amendments according, such stops must be justified by probable cause or a reasonable suspicion, based on specific and articulable facts of unlawful conduct". <u>U.S. V. Oates</u>, 514 F.Supp.2d 221, 225 (D.Conn 2007). This protection extends to vehicle stops. <u>U.S. v. Wilson</u>, 699 F.3d 235, 242 (2nd Cir. 2012). [T]o satisfy his burden and to establish that he had probable cause, defendant must demonstrate that in procuring plaintiff's arrest he had a quantum of evidence more that rumor, suspicion, or even strong reason to suspect. <u>Id</u>. Because probable cause standard is "fluid and contextual, a court must examine the totality of the circumstances of the given arrest." <u>U.S. v. Delossanntos</u>, 536 F.3d 155, 159 (2nd Cir. 2008). The police officer experience along with behavioral pattern that are specific and articulable should not be disregarded. <u>U.S. v. Fisher</u> 708 F.2d @378; <u>U.S. v. Delossantos</u>, 536 F.3d @ 161. "Probable cause only exists when there are facts and circumstances sufficient to warrant a prudent man believing that the [suspect] has committed or was committing an offense". <u>Weinstock v. Wlik</u>, 296 F.Supp.2d 241, 247 (D.Conn. 2003).

Prior to the stop, Officer DeFrance and Officer Kraeger put in a plan to stop the vehicle the plaintiffs were in. Ex7, p22; Ex12, #2; At that time the information available to these officers was an anonymous tip Wanda, Lee and Hector sold narcotics or sold Heroin out of red building or 44 Rome Avenue. Ex8, #b-c; Ex11. Officer Kraeger was able to confirm an address and got a description of a vehicle from the police station computer. Ex6, p. 19-20.

Officer DeFrance initially reasons for stopping the vehicle the plaintiffs were in was a windshield wiper was defective; and the center rear light was out. Ex3, p. 31-32.

i.     No reason existed on September 23, 2012 for Ms. Sampel to have on the wiper blades activated at the time Officer DeFrance stopped the vehicle she was driving. On that day and at that time, it was not raining. Ex3, p. 32. Officer DeFrance offers no factual basis that it was raining.

ii.     Officer DeFrance stated that he observed a center brake lamp was inoperable. Ex9. Officer DeFrance admitted he observed two operation brake lamps, and that he knows the motor vehicle laws of Connecticut which requires at least two operable brake lamps. Ex5, p31–32; C.G.S. sec. 14-96e(a). No probable cause of a crime or no reasonable suspicion for a motor vehicle violation.

iii.     Officer DeFrance charged Ms. Sampel with driving with an obstructive view blocked by handicap placard. Ex9. Officer DeFrance could not describe any obstructed driving patterns after following the vehicle for three blocks about a half-mile. Ex5, pp23; 33-34; 37-38; 57-59; Ex9. Officer DeFrance is aware that a minor obstructed view is not enough for a "primary stop on a motor vehicle". Ex5, p29. The Supreme Court of Connecticut spoke on this issue "the state was required to show that the chain

and/or cross that he had observed was, or had been, obstructing the defendant's vision or distracting his attention…..there had to be some evidentiary basis upon which the court could have drawn that conclusion". <u>State of Connecticut v. Gregory Cyrus</u>, 297 Conn, 829, 838 (Conn. 2010). Just like the police officer in <u>State v. Cyrus</u>, Officer DeFrance needed to articulate an evidentiary basis which a court could draw a conclusion that the handicap placard was obstructing the defendant's vision or distracting her attention. In fact, Officer DeFrance admitted he "did know what she couldn't see." <u>Ex5</u>, p26-27. However, Officer Kraeger was fully knowledgeable of the rights of driver to have items hanging from the rearview mirror, and the protections Connecticut law affords these drivers. <u>Ex5</u>, p29.

Officer DeFrance offers an alternative ground to uphold obstructive driving. Officer DeFrance now argues that violations of C.G.S. § 14-253a(d)[7] is enforced through C.G.S. § 14-99f[8]. Brief. P._ In Officer DeFrance police report dated September 23, 2012, he writes "a large handicap parking pass hanging on the rear view mirror, obstructing the operators view." <u>Ex9</u>. It is very clear, on September 23, 2012 at the time of Officer DeFrance stop the vehicle, Officer DeFrance did not find Ms. Sampel drove in violation of Connecticut laws, statutes, and/or regulations for handicap placards.

Officer DeFrance offers no supporting law for his theory; and he misquotes C.G.S. § 14-253a(d) and the regulation DMV Reg. 14-253a-22[9] as support of his theory.

---

[7] C.G.S. sec. 14-253a(d) provides "Any placard issued pursuant to this section shall be displayed by hanging it from the front windshield rearview mirror of the vehicle when utilizing a parking space reserved for persons who are blind and persons with disabilities.

[8] C.G.S. sec. 14-99f(c) provides "No article, device sticker or ornament shall be attached or affixed to or hung on or in any motor vehicle in such a manner or location as to interfere with the with the operator's unobstructed view of the highway or to distract the attention of the operator.

[9] DMV Reg. 14-253a-22 provides the regulation requires the handicap placard "shall be displayed by hanging it from the front windshield rearview mirror of any vehicle utilizing a parking space reserved for persons with who are blind or persons with disabilities.

Even if Officer DeFrance is correct, he still needs to articulate his evidentiary basis for an obstructive driving pattern. Probable cause exists when there is an evidentiary basis a Court can draw a conclusion of obstructive driving. Id.

4.     Duration of the Stop

The temporary detention of an induvial during a traffic stop is subject to limitations under the Fourth Amendment as a seizure of the person". Holeman v. City of New London, 425 F.3d 184, 198 (2nd Cir. 2005). "The detention…must be founded upon a reasonable suspicion supported by articulable facts that criminal activity may be afoot". U.S. v. Tehrani, 49 F.2nd 54, 59 (2nd Cir 1995). "If the investigation detention is properly premised upon articulable suspicion, the next inquiry is whether its scope and duration are reasonable". Id.

The detention of the plaintiffs is premise on a motor vehicle stop. Ex9. In this context, Officer DeFrance was required to have "reasonable suspicion based on "specific and articulable facts". U.S. V. Oates, 514 F.Supp.2d 211, 225 (D.Conn. 2007). Officer DeFrance can not articulate specific facts to support the stopping of this vehicle, as evidence by Officer DeFrance reliance on enforcement of handicap placard statutes and regulations enforcement via the obstructive driving statute.

5.     Plain View Search

The Fourth "Amendment…protects individual privacy against certain kinds of governmental intrusion…" Soldal v. Cook County, 506 U.S. 56 (1992). A search compromises the induvial in privacy. Horton v. California, 496 U.S. 128, 133 (October Term 1989). "[P]lain view seizures have been scrupulously subjected to Fourth Amendment inquiry"…. "Thus the absence of consent or a warrant permitting the

seizure of the item in question, such seizures can be justified only if they meet probable-cause standard..." Id. Also, "[w]arrantless searches are presumptively unreasonable." Kerman v. City of New York, 261 F.3d 229, 235 (2nd Cir 2001). Plain view requires the police to be at a "place from which the evidence could be plainly viewed…the character must also be immediately apparent…and he or she must also have a lawful right of access to the object itself." Id. @136-137.

Officer Kraeger claims the HerbaLife product was in plain view. However, Officer Kraeger leaves a lot of facts out in their plain view position. During his deposition, which is incorporated herein Officer Kraeger recital of the facts of his plain view observation of the HerbaLife product. Ex6, 44-45. It is clearly impossible for Officer Kraeger standing two feet away on the outside of the van looking back at Mr. Pickering, who is sitting in the front passenger seat, to look straight down the plain of the right interior side wall of the van, to see the cup-holder which was beyond and below the sliding door tinted window, to see the HerbaLife Product in the cup-holder. This is impossible.

6.    False Arrest

The issue is the stop of the vehicle.

"To prevail on a claim of false arrest, "a plaintiff must establish that (1) the defendant intentionally arrested him … (2) the plaintiff was aware of the arrest, (3) there was no consent to arrest, and (4) the arrest was not supported by probable cause." Weinstock v. Wilk, 296 F.Supp3d 241 (D.Conn 2003). [T]o satisfy his burden and to establish that he had probable cause, defendant must demonstrate that in procuring plaintiff's arrest he had a quantum of evidence more that rumor, suspicion, or even strong reason to suspect. Id. Because probable cause standard is "fluid and contextual,

a court must examine the totality of the circumstances of the given arrest." <u>U.S. v.</u> <u>Delossanntos</u>, 536 F.3d 155, 159 (2nd Cir. 2008). The police officer experience along with behavioral pattern that are specific and articulable should not be disregarded. <u>U.S.</u> <u>v. Fisher</u> 708 F.2d @378; <u>U.S. v. Delossantos</u>, 536 F.3d @ 161. Clearly the defendants intentionally arrested the plaintiffs. Clearly the plaintiffs were aware of the arrest. Clearly the plaintiffs did not consent to be arrest. <u>Ex4</u>, p92; <u>Ex21</u>.

The "quantum of evidence" consisted of an unreliable anonymous tip of drug dealing out of 44 Rome Avenue, Officer Kraeger searching the police computer confirming the address, and a description of a vehicle. Based on this information, Officer Kraeger, Officer DeFrance, and Sergeant Luk put a plan in place to stop a vehicle leaving 44 Roam Avenue that fit the description of the vehicle he determined by searching police station computer. Depo of SergLuk.

Plaintiff arrested without probable cause: the vehicle stop lacked an articulable objective reasonable suspicion for a motor vehicle violation; and the warrantless search based on plain view sighting of the HerbaLife Product by Officer Kraeger is unbelievable; and the anonymous tip lack content and reliability. The stop and arrest was based on suspension.

7.    Possession of HerbaLife Product by Mr. Pickering

Absent evidence of such purposeful behavior, mere presence at the scene of a crime, even coupled with knowledge that at the moment a crime is being committed, is insufficient to establish possession. <u>U.S. v. Rios</u>, 856 F.2d 493, 496 (2nd Cir. 1988); <u>U.S.</u> <u>v. Johnson</u>, 513 F.2d. 819, 823-824 (1975). "[J]oint tenancy of a residence is insufficient to prescribe possession to all the occupants…" <u>U.S. v. Morrison</u>, 991 F.2d 112, 115 (4th

Cir. 1993). "Possess may be actual or constructive…" <u>U.S. V. Farris</u>, 77 F.3d 391, 395 (11th Cir. 1996). "Constructive possession exists when the defendant exercises, or has the power to exercise, dominion and control over the item." <u>U.S. v. Morrison</u>, 991 F.2d @ 114. "To establish constructive possession of cocaine, the government must put forth evidence demonstrating ownership, dominion or control over the contraband." U.S. v. Johnson, 26 F.3d 669, 685 (7th Cir. 1994).

Ms. Sampel told Officer Kraeger that this was HerbaLife Product that she takes for weight loss. Ex5, p52; p. 52; Ex6, p57-58; <u>Ex9</u>. Mr. Pickering told Officer Kraeger that the HerbaLife product owner is Ms. Sampel. <u>Ex4</u>, p. 91. There is no evidence that Mr. Pickering possessed, owned, controlled, or exercised dominion over the HerbaLife Product, and the defendants knew this was not Mr. Pickering product

"Probable clause exists when the police know reasonable trustworthy information sufficient to warrant a prudent person in believing that the accused had committed or was committing an offense." <u>U.S. v. Butler</u>, 74 F.3d 916, 920 (9th Cir. 1996). "Mere suspicion of criminal activity, even if reasonable, does nor suffice. Courts look at the totality of the circumstance known to the officer in determining if there is probable cause for an arrest." <u>Id</u>.

Officer Kraeger received one anonymous tip from two different persons. The male informant wanted to pass on information *he received* of individuals dealing narcotics in the northend. <u>Ex6</u>, p10-11. Or the woman arrested on September 22, 2012. <u>Ex5</u>, p13-14; <u>Ex8</u>, #3b-c. Mr. Pickering arrested based on being the Lee from the day before. <u>Ex5</u>, p52.

Police received a reliable tip "that a pregnant woman accompanied by a small child was going to meet a woman who would be arriving at the San Diego airport carrying cocaine" and confirmed the information by observation. U.S. v. Woods, 720 F.2d 1022, 1026 - 1027 (1983). "In White, the police received an anonymous tip asserting that a woman was carrying cocaine and predicting that she would leave an apartment building at a specified time, get into a car matching a particular description, and drive to a named motel. Standing alone, the tip would not have justified a *Terry* stop. Only after police observation showed the informant had accurately predicted the woman's movements, we explained, did it become reasonable to think the tipster had inside knowledge about the suspect and therefore to credit his assertion about the cocaine." Florida v. J.L., 529 U.S. 266, 270 (October Term, 1999). The tip Officer Kraeger received was not confirm. Instead, these officers put a plan in place to stop the motor vehicle Ms. Sampel was driving. Ex7, p.22; Ex22, #2.

The content and details of the anonymous tip was low only providing names and address and an allegation of selling heroin. The reliability is lacking because the anonymous tip is fixed in time, without future activity of the plaintiffs the police could have observed. Also, the police disregarded exculpatory evidence that Mr. Pickering did not own, control, possess, or exercise dominion over the HerbaLife Product. Mr. Pickering arrest was based on suspension.

8.  Counts Three and Four

a.  Wanda Sampel

Ms. Sampel would not have had plea but for the violation of her rights to be free from unreasoned seizure in violation of her Fourth Amendment rights.

"A Section 1983 claim requires a showing that the plaintiff was deprived of rights, privileges, or immunities secured by the Constitution and laws. Section 1983 claims of deprivations of liberty related to criminal prosecution implicate the Fourth Amendment right to be free of unreasonable seizure of the person." Burg v. Gosselin, 591 F.3d 95, 97 (2nd Cir. 2010). A seizure occurs only where a law enforcement official, by means of force or show of authority, has restrained the liberty of a citizen. Harris v. Wydra, 531 F.Supp.2d 233 (D.Conn. 2007). Officer DeFrance stopped the vehicle Ms. Sampel was driving without even having reasonable suspicion that a motor vehicle violation occurred or occurring, could be deemed as the fruit of illegal detention. Hayes v. Florida, 470 U.S. 811, 813 (October Term 1984). At that point Ms. Sampel seized in violation of her Fourth Amendment rights. The motor vehicle stop based on suspicion.

b.     Green v. Webster

Defendants rely on Green v. Webster, 359 F.App'x 249 (2d Cir, 2010). These cases are similar in that it is evident that these field test kits are inherently unreliable to detect narcotics. Ex14.  Unlike Green, the testing of the HerbaLife Product resulted from an unreliable anonymous tip, a motor vehicle stop without having objective probable cause or a reasonable suspicion of illegal activity occurring by the plaintiffs.

In Green, the defendant had the burden of demonstrating "that a martial question of fact existed as to whether the field test result was reasonably trustworthy information." Green v. Webster, Jr., 359 Fed.Appx. 249, 251 (2010). The testing of the HerbaLife Product is unreliable. As described above, the first two tests of the product did not lead to an arrest of the plaintiffs, and Officer Kraeger continued to search the

van. Ms. Sampel saw the results of the second test, and saw no color change. After the second test, the defendants continue holding the plaintiffs in custody as they waited for Sergeant Lukanik to arrive on the scene. Once Sergeant Luk anikarrived, a test kit retried from his cruiser, Sergeant Lukanik blocked Ms. Sampel view, and Officer Kraeger announced "arrest them it is drugs".

In Green v. Webster case the color of the product tested was white. Green v. Webster, 359 F.App'x @ 255. The question is what was tested the third time? The HerbaLife Product color is tan/ beige. Ex33, #7. Officer DeFrance described color of the product as off-white. Ex22. Officer Romonti checked in a white/brown product into the evidence. Ex25. Officer Kraeger tested a yellowish product. Ex11. Officer DeFrance did not see the yellowish product Officer Kraeger tested. Ex5, p. 55.

5.      Qualified Immunity

Government officials performing discretionary functions are entitled to qualitied immunity if their conduct does not violate clearly established statutory or constitutional rights that a reasonable person would have known. Palmieri V. Kammerer, 690 F.Supp2d @ 46. Courts follow a two step process, "viewing the evidence most favorably to the plaintiff, the officer's conduct violated a constitutional right". Scott V. Harris, 550, U.S. 372, 377 (2007); (Ehrlich v. Town of Glastonbury, 348 F.3d 48, 55 (2nd Cir. 2003). "If the violation is established, the next step is to ask whether the right was clearly established." Id. When facts are in dispute, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion. Scott V. Harris, @ 378. "Credibility determinations, the weight of the evidence, and the drawing of legitimate inference from facts are jury

functions, not those of a judge. <u>Colon v. Ludemann</u>, 283 F.Supp.2d 747, 751 (D.Conn 2003). When reasonable persons applying the proper legal standards the questions raise on the basis of the evidence presented, the question is best left to the jury. <u>Id</u>.

    a.    Police Stop

Plaintiff incorporates herein from "D. - Arguments" the following sections: Sections 2, 3, and 4; and Section 7 only paragraph 5 herein.

Defendants infers *Terry* stops are inherently predicate upon police "discretion" is misplaced. The principles of *Terry* stops in the context of a motor vehicle stop are embodied into the Connecticut Constitution which is the reasonable articulable suspicion standard. <u>State v. Mikolinski</u>, 256 Conn. 543, 551 (July, 2001). The decision to stop a vehicle once reasonable articulable suspicion is established is discretionary.

Officer DeFrance is required to have a reasonable articulable suspicion that a motor vehicle violation is occurring or occurred. <u>Id</u>. In the records of September 23, 2012 there is no support for Officer DeFrance stopping this vehicle because of a violation of the handicap placard statutes or regulations, or language printed on the handicap placard. The Incident Report dated September 23, 2012 author by Officer DeFrance states as follows: "Wanda Sampel charge: Violation code: 14-98f – Def Windshield/Wipers; Windshield/Article/Device Obstructing. Where "Obstructing" described as "a large handicap parking pass hanging on the rear view mirror, obstructing the operator's view." <u>E11</u>.

Defendants argue that if reasonable officers would agree or disagree on this point is vague. (see top of page 18, Motion for Summary Judgment). It is not clear if Officer DeFrance is referring to the initial stop that lacked a reasonable articulation

suspicion, or post stop defense which claims enforcement of the handicap placard via obstructive driving laws. Defendants offer no facts to support the claim.

A *Terry* stop by Officer DeFrance of the motor vehicle without having a reasonable articulable suspicion is a clearly violation of plaintiff's Fourth Amendment rights. This right is clearly established. A reasonable police officer would know that he or she can not stop a motor vehicle without having a reasonable articulable suspicion or probable cause that a motor vehicle violation is occurring or occurred.

b.      Field Test of HerbaLife Product

Plaintiff incorporates herein from "C. – Defendant Claims of Undisputed Facts" the following sections: Sections 1, 4, and 5.

Plaintiff incorporates herein from "D. – Arguments" the following sections: Sections 2, 5, 7, and 8b.

Defendants are not entitled to qualitied because material facts are in dispute regarding the testing of the HerbaLife Product, as follows; the testing results of the HerbaLife Product; defendant's actions show lack of probable cause; Ms. Sampel saw the second test results; and what was the color of the substance Officer Kraeger tested the third[10] time resulting in the arrest of the plaintiffs.

c.

Article 1, Section 7 of Connecticut Constitution of 1965 provides "[t]he people shall be secure in their persons, house papers and possession form unreasonable searches and seizures…"

---

[10] Defendants claim Officer Kraeger performed the first test of the powdery substance and a second test performed by Sergeant Luk. The third test performed, out of sight of the plaintiffs, in the police station by Officer Kraeger.

Defendants argue that <u>Binette V Suto</u> required "egregious conduct" to maintain a cause of action. In recognizing claims under Article 7 and Article 9 of the Connecticut Constitution, the Court "decline, as a matter of policy, to treat the harm that results from the abuse of governmental power as equivalent to that which arises from the commission of a battery or trespass by a private citizen." <u>Binette V Suto</u>, 244 Conn 23, 49 (March,1989). "[U]like the other remedies available to the plaintiffs, a *Bivens*-type remedy comprehends both the fundamental nature of the rights protected by the constitutional provisions and the special significance of the duty breached by the violation". <u>Id</u>. Plaintiffs can meet this requirement.

Plaintiff's claims under Connecticut Constitution are claims for remedy available for violations of the Constitution rights.

d.    Negligence

C.G.S. § 52-557n(a)(1) provides [e]xcept as otherwise provided by law, a political subdivisions of the state shell be liable for damages to person or property caused by: (A) The negligent acts or omission of such political subdivision or any employee…acting within the scope of his employment or official duties."

The law does not encourage lawlessness by police officers. In <u>Russo, v. City of Bridgeport</u>, the police hid exculpable evidence from the defendant. <u>Russo, v. City of Bridgeport</u>, 479 F.3d 196 (2nd Cir.) Those Bridgeport Police Department officer's action were not within the scope of the employment or their official duties.

In this matter, Officer DeFrance act of stopping the vehicle without probable cause or a reasonable articulable suspicion is not as an act within the scope of the employment or office duties. Officer Kraeger warrantless search of the van is not an act

within the scope of the employment or official duties. (The defendants in their Motion for Summary Judgment Motion claims plain view sighting through the rear window without naming the officer who made the plain view sighting). Three tests of the HerbaLife Products. Ms. Sample witnessed the results of the second test, and testified there was no change in the color of the fluid in the test vile after the test. This raise an inference these police officers acted outside the scope of their employment or official duties.

This case is not ripe for summary judgment.

Plaintiffs
Leal R. Pickering
Wanda Sampel


By    /ss/ Mark S. Loman
Mark S. Loman
CT19489
The Law Office of MARK S. LOMAN
116 Cottage Grove Road, Ste. 101
Bloomfield, CT 06002
(O) 860-761-2530
(F) 860-760-6231
atty_loman@att.net

CERTIFICATION

I hereby that on March 7, 2016a copy of the foregoing MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT with
attached exhibits was filed electronically and serviced by mail on anyone unable to
accept electronic filling. Notice of the filing will be sent by e-mail to all parties by
operation of the Court's electronic filing system or by mail to anyone unable to accept
electronic filing. Parties may access this filing through the Court's system.

/ss/ Mark S. Loman
Mark S. Lomanm
Attorney for the Plaintiff
116 Cottage Grove Road, Suite 101
Bloomfield, CT 06002
Voice: (860) 761-2530
Fax:    (860) 760-6231